**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALCO INDUSTRIES, INC.,

                    Plaintiff,

    v.

WACHOVIA CORPORATION, et al..,

                    Defendans.

Civ. No. 04-6090

**OPINION**

Pollak, J.                                        November 5 , 2007

      Presently before the court are the parties' cross-motions for summary judgment (Docket Nos. 43 and 45) and cross-motions *in limine* to exclude each other's expert witnesses (Docket Nos. 44 and 46). These motions are now ripe for disposition.

**I.    Background**

      Plaintiff Alco Industries provides retirement benefits to some of its employees through two defined benefit pension plans.[1] The parties agree that the Alco plans are

---

[1] There are two major categories of pension plans: (1) defined benefit plans, and (2) defined contribution plans. In a defined benefit plan, the participant's benefits are determined according to a formula that typically emphasizes salary and years of service. The benefits are paid out of a segregated trust fund that the employer funds and invests. *See Int'l Union of Elec., Salaried, Mach. & Furniture Workers v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 894 (3d Cir. 1992). In a defined contribution plan, the participant and employer contribute money to a participant's individual account in a larger trust fund. The participant selects how to invest the money in the account from a closed set of options provided by the trust's manager. Rather than

"employee benefit plans," and thus governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 20 U.S.C. §§ 1001–1461.  Rather than managing the plans' trust funds itself, Alco entrusted the funds' management to Wachovia[2] between 1989 and 2002.  ERISA expressly authorizes delegating the management of an ERISA trust to a professional investment manager.  29 U.S.C. § 1102(c)(3).

As investment manager, Wachovia owed the plans' participants and beneficiaries a series of fiduciary duties, one of which was the duty of prudent investment.[3]  29 U.S.C. § 1104(a)(1)(B)–(C).  This duty is a familiar one, as it has long bound common-law trustees, and, as in trust law, there is a heavy presumption that fulfilling that duty requires diversifying investments to reduce the risk of a large loss.  29 U.S.C. § 1104(a)(1)(C); *see*

---

receiving a formula-determined benefit, the employee receives as benefits the contributions to her account plus any investment gains, minus any investment losses.  *See Graden v. Conexant Sys., Inc.*, 296 F.3d 291, 294, 297 (3d Cir. 2007).

The economics of the two types of plans are quite different.  In defined benefit plans, participants are entitled to their formula-determined benefits irrespective of the performance of the trust's investments.  Thus, while participants have an interest in the trust being fully funded, they have little interest in any excess profits.  Employers, on the other hand, have a great interest in the plan's profitability because excess profits reduce the amount they have to contribute to keep their plans fully funded.  *See Malia v. Gen. Elec. Co.*, 23 F.3d 828, 831 n.2 (3d Cir. 1994).  In defined contribution plans, on the other hand, all profits inure to the participants' (rather than employers') benefit, so it is they who have a significant interest in their accounts' profitability (and bear the risk of investment loss).  *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 661–62 (4th Cir. 1996).

[2] I use "Wachovia" to refer collectively to the defendants, all of which are affiliates or predecessors-in-interest of defendant Wachovia Bank.

[3] Though Alco is the plaintiff, Wachovia did not owe Alco any fiduciary duties.  Rather, the provision under which Alco is suing, 29 U.S.C. § 1132(a)(2), allows one plan fiduciary (here, Alco) to bring an action against another plan fiduciary (here, Wachovia) to make good to the plan any losses caused by the defendant-fiduciary's breach of duty.

*also* Restatement (Third) of Trusts § 90(b) (2007).

From at least 1998 until the end of 2002, Wachovia, through equity portfolio manager Steven Dalton, pursued an investment strategy that focused on "large-cap secular growth" stocks.[4]  Alco alleges that, in pursuing this strategy, Wachovia breached its duty of prudent investment by failing to diversify the equities portion of the plans' portfolios.  Alco claims that investments were unduly concentrated in large-cap growth stocks and, more specifically, in the technology, media, and telecommunications industries, which resulted in significant and avoidable losses.  Wachovia disputes this, arguing that its investments were consistent with Alco's guidance on the character and purpose of the plans, that Alco's proof that the portfolios were not diversified is flawed in a number of key respects, and that Alco's proof of damages is similarly flawed.

When this breach of duty—if it was a breach—began is also a subject of controversy.  Alco claims that the breach began in July 1999 when it adopted a formal

_____

[4] A company's market capitalization is measured by multiplying its stock price by the total number of shares it has issued.  *See* Sec. & Exch. Comm'n, Market Capitalization, *available at* http://www.sec.gov/answers/marketcapitalization.htm.  Though the precise contours of the "large-cap," "mid-cap," and "small-cap" categories are disputed, the basic idea is that they divide all public companies into three categories based on their amount of market capitalization.

"Secular" refers to a relatively long time-frame. Oxford English Dictionary (2d ed. 1989).  "Growth" stocks, as Steven Dalton explained in his deposition, are those for which analysts expect the underlying companies to turn in increasing, above-average earnings.  Dalton Dep. at 66–67.  "Secular growth" stocks, then, are those that analysts expect to turn in higher-than-average earnings over a relatively long period of time.  *Id.*  The typical contrast is "value" stocks, which are thought to be undervalued relative to the expected performance of the underlying company.  *Id.*  As both categories are defined by analysts' expectations, it is rarely clear whether a particular stock belongs in one category rather than the other.  *Id.*

investment policy statement that called for the plans' assets to be "well-diversified" and spread among small-, mid-, and large-cap stocks.  Investment strategy policies are typically considered "plan documents" that investment managers must follow in exercising their discretion.  29 U.S.C. § 1104(a)(1)(D).  Wachovia, on the other hand, claims it employed the same investment strategy from at least 1996 and that Alco understood and approved of that strategy.  According to Wachovia, then, the breach—if there was one, which it of course denies—began no later than 1996.

It may seem bizarre for Wachovia, while strenuously denying any breach, to argue in the alternative that the breach began earlier than plaintiff asserts.  But the reason is simple: the disputed strategy was apparently quite profitable in the heady 1990s, and only became unprofitable during the so-called "dot com bust" and "telecom meltdown" of 2000–2001.[5]  Under well-settled principles of trust law, defendants are entitled to offset profits from a single, continuous breach of trust against losses flowing from that same breach, *see* Restatement (Third) of Trusts: Prudent Investor Rule § 213 (1992), so Wachovia has a significant interest in showing that any breach began well before the market turned sour in 2000.

After voluminous discovery, the parties have filed related cross-motions *in limine* to exclude each others' expert witnesses and for summary judgment.  Because the cross-

---

[5] These phenomena were well documented in the press.  *See, e.g.*, Peter Elstrom & Heather Timmons, *Telecom Meltdown*, BusinessWeek, Apr. 30, 2001, at 100; John Schwartz, *Business on internet time; the ups are fast.  The downs could be faster.*, N.Y. Times, Mar. 30, 2001, at C1.

motions for summary judgment rely heavily on the exclusion of expert testimony, I will

begin with the question of whether the four experts (three for Alco, one for Wachovia)

meet the threshold set by the rules of evidence for offering expert testimony.  Then,

bearing in mind which experts may offer testimony at trial, I will address the cross-

motions for summary judgment.

## II.   Motions *in limine*

### A.   Legal standard

Under Federal Rule of Evidence 702, courts must allow expert testimony when

"(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case."  These requirements are often referred to in

shorthand as "qualification, reliability, and fit."  *See, e.g.*, *In re Unisys Sav. Plan Litig.*,

173 F.3d 145, 156 (3d Cir. 1999).  Under the rule announced in *Daubert v. Merrill-Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and expanded in *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137 (1999), district courts must ensure that experts—scientific and

otherwise—will offer testimony that is methodologically sound and relevant to the facts

of the case before admitting their expert testimony.  *Daubert*, 509 U.S. at 590–91;

*Kumho*, 526 U.S. at 149.

In considering whether to admit expert testimony, it is important to remember that

"Rule 702 mandates a policy of liberal admissibility."  *In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 741 (3d Cir. 1994).

> *Daubert* does not require that a party who proffers expert testimony carry
> the burden of proving to the judge that the expert's assessment of the
> situation is correct.  As long as an expert's scientific testimony rests upon
> good grounds, based on what is known, it should be tested by the adversary
> process—competing expert testimony and active cross-examination—rather
> than excluded from jurors' scrutiny for fear that they will not grasp its
> complexities or satisfactorily weigh its inadequacies.  In short, *Daubert*
> neither requires nor empowers trial courts to determine which of several
> competing scientific theories has the best provenance.  It demands only that
> the proponent of the evidence show that the expert's conclusion has been
> arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (internal

quotation marks and citations omitted) (*quoted in United States v. Mitchell*, 365 F.3d 215,

244 (3d Cir. 2004)).

Because this case arises under ERISA, a statute grounded primarily in equity, it

will not be tried before a jury.  *See Motor Carriers Labor Advisory Council v. Trucking

Mgmt., Inc.*, 731 F. Supp. 701, 703 (E.D. Pa. 1990).  In the context of preparing for a

bench trial, it is not necessary to apply the *Daubert* standard with full force in advance of

trial.  *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Where the gatekeeper and the

factfinder are one and the same—that is, the judge—the need to make such decisions

prior to hearing the testimony is lessened.").  Rather, the court has the flexibility to allow

testimony provisionally and revise its view once the testimony is taken.[6]  *Id.*  Thus, at this

---

[6] None of this is to say that the court may rule on the merits on the basis of fundamentally
flawed testimony; it is only to say that the court may defer the final decision on whether
testimony is admissible until after that testimony is taken at trial.

stage, I will incline toward hearing expert testimony unless it is clear from the reports and

depositions that the testimony cannot prove helpful to resolving this case.

**B.      Dr. Cathy Niden**

Dr. Cathy Niden, an economist whom Alco proposes as an expert witness, has

prepared a report on whether the Alco plans' portfolios were diversified.[7]  She concluded

that they were not.  According to her report and deposition testimony, perfect

diversification occurs when a portfolio eliminates all risk except so-called "market" or

"compensated" risk.  Niden Report, at 6.  This view of diversification is well-accepted.

*See, e.g.*, Restatement (Third) of Trusts: Prudent Investor Rule § 227 cmt. g ("The

ultimate goal of diversification would be to achieve a portfolio with only the rewarded or

'market' element of risk.").  Unfortunately, according to Niden, the perfectly diversified

"market portfolio" exists only in the realm of theory.  Niden Report, at 7.  Therefore, to

determine how diversified a given portfolio is, one can only compare it to a proxy for the

market portfolio.  *Id.*  Here, Niden compared the Alco portfolios to the S&P 500, the S&P

MidCap 400, and the Russell 2000, the benchmark indices specified in Alco's 1999

investment policy statement.  Niden noted that the S&P 500 was a particularly good

proxy.  *Id.* at 7–8.  Through these comparisons, Niden calculated that up to 38 percent of

---

[7] Niden holds a Ph.D. in business and an M.B.A., from the University of Chicago.  She has taught financial economics, including the principles of diversification, at the University of Notre Dame and the University of Pittsburgh.  She has also worked as an academic fellow and an associate chief economist at the Securities and Exchange Commission, and an economist at Lexecon.  She presently works as an economist at LECG, a firm that provides litigation support services, including the provision of expert reports and testimony.

the risk in the Alco portfolios was uncompennsated (non-market) risk.  *Id.* at 13.  She

further reported that this amount of uncompensated risk was both foreseeable in light of

the investments and unreasonable.  *Id.* at 9–11.  She concluded that Wachovia could have

reduced the uncompensated risk and added to the expected return significantly through

additional diversification.  *Id.* at 14.

Wachovia raises five objections to Niden's testimony.  First, it argues that Niden's

analysis did not properly take account of the character and aims of the plans, and is thus

unreliable.  I disagree.  While it is true that the factfinder should consider the purpose of

the plan, *see In re Unisys Sav. Plan. Litig.*, 74 F.3d 420, 434 (3d Cir. 1996), here, Niden

testified that her method did not—and did not need to—take into account the investor's

goals because a high level of uncompensated risk is inconsistent with any reasonable

investor's goals.  Niden. Dep., at 35.  Moreover, by measuring diversification against

benchmarks identified in Alco's policy statement (one of which was the S&P 500), Niden

arguably did consider Alco's preferences.  More to the point, Niden's

methodology—measuring diversification by comparing a given portfolio to a benchmark

portfolio—appears well-supported in the finance literature.  *See, e.g.*, Frank J. Fabozzi,

Investment Mgmt. 90–91 (1995).

Second, Wachovia argues that Niden did not consider that Alco had a lengthy time

horizon, which, according to some of the caselaw, is a relevant factor.  *See Metzler v.

Graham*, 112 F.3d 207, 210 (5th Cir. 1997).  Niden, however, testified that her method

did not need to take time into account because, again, a reasonable investor would not desire a high level of uncompensated risk over any time horizon.  Niden Dep., at 50–51. Indeed, when courts hold that relatively more risk can be appropriate over a relatively longer time horizon, they appear to be (and, indeed, should be) referring to *compensated* risk.  Uncompensated risk is by definition never attractive.  Compensated risk, on the other hand, increases in attractiveness as the time horizon lengthens because, given enough time, returns should approach their (higher) expected value.[8]

Third, Wachovia argues that Niden should have considered the overall portfolios to determine diversification, not just the equities portions.  But the duty of diversification extends into an ERISA plan's asset classes.  *Cf.* Restatement (Third) of Trusts § 227 cmt. f(3) (1992) ("So far as practical, the duty to diversify ordinarily applies even within a portion of a trust portfolio that is limited to assets of a particular type or having special characteristics.").  It is undisputed that a portion of the assets were to be invested in equities.  What Niden analyzed was whether the equities portions of the portfolios were diversified.  At this stage, I have no reason to think this was an inappropriate inquiry.

Fourth and fifth, Wachovia complains about Niden's analysis of damages.  Alco notes, however, that Niden did not claim to analyze the damages in this case, leaving that to Alco's damages expert, Steven Wolf.  Thus, Wachovia's objections are misplaced.  Of

---

[8] It may be noted that in *Metzer*, a facially undiversified investment in commercial real estate was justified on the ground that it was a hedge against the threat of rising inflation. *Metzer*, 112 F.3d at 211.

course, should Niden attempt to offer testimony on Alco's damages at trial, I will reconsider Wachovia's objection at that time.

In sum, without determining the ultimate credibility of any testimony that Niden may offer, defendants have raised no objections to her testimony serious enough to exclude it from trial.  Therefore, as to Niden, Wachovia's  motion *in limine* will be denied.

### C.    Steven Wolf

Steven Wolf, a forensic accountant proposed as an expert by Alco, has offered a report on Alco's damages stemming from Wachovia's alleged imprudent investments.[9] Specifically, he compared the performance of the Alco portfolios against four portfolios Alco believes would have been more in line with its policy statement and the duty of prudent investment: (1) a portfolio equally spread among small-, mid-, and large-cap index funds, (2) a portfolio comprised of 60% small-cap index funds, and 20% each of mid- and large-cap index funds, (3) a portfolio comprised of 60% mid-cap index funds, and 20% each of small- and large-cap index funds, and (4) a portfolio comprised of 60% large-cap index funds, and 20% each of small- and mid-cap index funds.  Wolf Report, at 8–9.  All four performed better than the Alco portfolios between July 1, 1999 (Alco's

---

[9] Wolf holds an M.B.A. from Temple University, and a Bachelor's degree in accounting from Binghamton University.  He is a certified fraud examiner and a certified public accountant. He has spent much of his career working as a public accountant at a "Big Four" accounting firm. He presently works as a principal at LECG, where he provides expert reports and testimony on a variety of forensic accounting subjects.

alleged start date) and December 31, 2001 (the undisputed end date). *Id.* at 18.

Wachovia objects to Wolf's testimony on the grounds that (1) he is not adequately qualified, (2) his methodology is flawed, (3) the portfolios to which he compared the Alco portfolios would not have been prudent investments, and (4) he used an improper time-frame. As to the first objection, Wachovia argues that Wolf's background as a forensic accountant does not qualify him to analyze Alco's damages. Specifically, Wachovia notes that Wolf had no previous experience with ERISA plans or with analyzing the damages flowing from imprudent investments. But Wolf appears qualified to carry out the "lost profits" methodology that both he and Wachovia's proffered expert used. *See* Wolf Dep., at 32 (testifying that he has carried our lost profits analyses many times). This method compares the performance of the actual portfolio against that of a benchmark portfolio to determine the difference. Making this calculation appears within the professional expertise of accountants.[10]

Wachovia's second objection—that Wolf's methodology is not appropriate for measuring damages in this case—is similarly unavailing. Wachovia argues that Wolf should have considered only the portion of each investment that was imprudent. In other words, if a manager invested 90% of a plan's assets in a stock that no prudent investor would place more than 10% in, the damages would be loss attributable to the imprudent 80% only, not the entire 90%. This may be sound logic, but as a criticism of Wolf's

---

[10] Evidence of this is that Wachovia's expert, Stewart Frank, who employed the same basic methodology, is also an accountant.

methodology it is misdirected.  Rather than evaluating individual investments, Wolf

compared the portfolios' performance against that of four allegedly more prudent ones to

determine the difference.  Other courts have approved this method as an acceptable means

of calculating damages flowing from a breach of the duty of prudent investment.  *See,*

*e.g.*, *GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobson, Inc.*, 895 F.2d 729, 733–34

(11th Cir. 1990).  This is not to say that it is necessarily the best method, but it easily

satisfies the threshold requirement of reliability for Rule 702 purposes.

Wachovia's third objection—that Wolf's benchmark portfolios are unreliable—is

weightier.  When advancing a lost profits analysis, the plaintiff has a basic obligation to

put forward "plausible" alternatives to the offending portfolio.  *See Donovan v. Bierwith*,

754 F.2d 1049, 1056 (2d Cir. 1985).  Here, Alco seems to argue that Wolf's comparator

portfolios are plausible because they all reflect a diversified mix of small-, mid-, and

large-cap stocks, as Alco's investment policy statement suggests.  Wolf Dep., at 38.  Alco

does not argue that Wolf is qualified to select a prudent portfolio; rather, it argues that his

comparator portfolios are clearly "plausible" from the face of the 1999 investment policy

statement and the general observation that index funds are assumed to be diversified

within the market segments they cover.[11]  Thus, Wachovia's argument that Wolf is not

qualified to select diversified portfolios misunderstands the nature of his proposed

testimony.  On the one hand, it may seem odd that Alco did not choose an expert qualified

---

[11] For example, it is generally assumed that the S&P MidCap 400 is diversified within the
universe of mid-cap stocks.

-12-

to select a diversified portfolio to serve as the benchmark; on the other hand, I agree with Alco that a factfinder could conclude that one or more of Wolf's portfolios is plausible simply by reading the policy statement, since the policy statement does, in fact, appear to call for some mix of small-, mid-, and large-cap stocks.  This is not to say that Wolf's portfolios  are not open to attack through cross-examination or rebuttal evidence, but they find enough support in the record to allow Wolf's testimony to proceed.

As to Wachovia's fourth objection—that Wolf used the wrong time-frame—the underlying question is when the alleged breach began.  This issue is disputed: Alco has presented evidence that, at least as of the adoption of the 1999 investment policy statement, Wachovia employed an imprudent strategy.  *See generally* Niden Report. Wachovia, in turn, has presented evidence that it pursued the same (potentially breaching) investment strategy from at least 1996 on.  *See* 1998 Investment Review; 1996 Investment Review.  It is not clear from the record which of these views is correct.  Niden formally analyzed the portfolios' level of diversification from July 1999 to the end of 2002, and her analysis appears to find fault not only with Wachovia's overall large-cap secular growth strategy, but also with its concentration of stocks in three particular industries. Though it appears that Wachovia began employing the allegedly offending investment strategy before July 1999, it is unclear when it began doing so and whether the portfolios suffered from any excess concentration in any particular industry before July 1999.

Moreover, Wolf's report is relevant to an issue on which Alco bears the burden of

proof: damages that accrued between 1999 and 2001.  Wachovia's contentions that (1) the

alleged breach began before 1999, and (2) the profits from that initial period completely

offset any 1999–2001 damages, are in the nature of an affirmative defense.[12]  Wachovia

bears the burden of proof on those contentions, *cf. Cook v. Wikler*, 320 F.3d 431, 438 (3d

Cir. 2003) (noting that defendant bears burden of proof on affirmative defenses), and

Alco has no obligation—in its expert report or otherwise—to come forward with evidence

on those subjects.  It would be inappropriate to exclude Wolf's report solely because it

does speak in terms to issues on which Alco need not come forward with evidence,

particularly when it is relevant to an issue on which Alco does bear the burden of proof.

Therefore, as to Wolf, I will deny Wachovia's motion *in limine*.

### D.    Paul Gewirtz

Paul Gewirtz, an actuary offered as an expert by Alco, has prepared a report

opining that Wachovia violated its duty of prudent investment by failing to diversify the

Alco plans' portfolios.[13]  Wachovia objects to his report on the ground that it is merely a

---

[12] An affirmative defense is one that bars recovery even if the facts alleged in the complaint are true.  Here, Wachovia's contentions form an affirmative defense because its basic point is that even if it breached its duty (as alleged in the complaint), and even if that breach caused damage between July 1999 and December 2002 (as alleged in the complaint), it is nonetheless not liable because the breach began, and resulted in off-setting profits, well before the period alleged in the complaint.

[13] Gewirtz holds a Bachelor's degree from Brooklyn College, and is a fellow of the Society of Actuaries and the Conference of Consulting Actuaries.  Over the course of a more-than-forty-year career, Gewirtz has worked as an actuary for Hartford Life Insurance Company, Towers Perrin, and Ernst & Young.  In 2004, having reached the mandatory retirement age of 60 for Ernst & Young partners, he formed his own actuarial consulting company, and he has worked there ever since.

series of legal conclusions.  *See Carswell v. Borough of Homestead*, 381 F.3d 235,

243–44 (3d Cir. 2004) (noting that expert testimony should not be allowed on questions

of law).  I agree.  A glance at Gewirtz's "questions presented" reveals that his report

addresses legal, not factual, questions.  *See, e.g.*, Gewirtz Report § B(3) ("Did the

Defendants violate their ERISA fiduciary duty . . . ?").  Indeed, the report contains no

substantive analysis of the risks inherent in the Alco plans' portfolios;[14] rather, it is

essentially a brief on the ultimate legal issues *sans* case citations.  Therefore, I will grant

Wachovia's motion *in limine* as to Paul Gewirtz: he will not be allowed to testify at trial,

and his expert report will not be admitted into evidence.

### E.    Stewart Frank

Stewart Frank, an accountant presented as an expert by Wachovia, has prepared a

report concluding that (1) the expert reports of Niden and Wolf are methodologically

flawed, and (2) Wachovia's investment strategy, when measured over a five-year period,

produced better returns than a benchmark diversified portfolio would have produced.[15]

Alco moves to exclude his testimony.

On the issue of diversification, Frank takes issue with Niden's use of the

---

[14] A lack that is somewhat surprising, because that would seem to be the sort of analysis one would expect from an actuary, as that profession specializes in the evaluation of risk.

[15] Frank holds a Bachelor's degree from the University of Michigan, and is a certified public accountant and an accredited investment fiduciary analyst.  Since 1965 he has practiced accounting at his own firm.  He is also a principal of the Tillit Group, a firm that provides litigation services, including expert reports and testimony.

portfolios' actual performance—rather than sticking to information available in 1999—to determine whether the portfolios were diversified.  Frank Report, at 4–5.  Frank further reports that were one considering only the information available in 1999, a portfolio emphasizing large-cap secular growth stocks would appear to offer a better risk/reward balance than the S&P 500 would.  *Id.*  This is an arguably legitimate criticism of Niden's methods and conclusions, and I see no reason to exclude it from trial.  It may be noted that Frank has disclaimed any intention of offering his own opinion on whether the portfolios were diversified at any given time.[16]  Frank Dep., at 149–51.  But because diversification is an issue on which Alco bears the burden of proof, it is acceptable for Wachovia's expert to poke holes in Alco's proof without offering its own.

On the issue of damages, Frank reports that Wolf's method was flawed since it analyzed the wrong time period and selected the wrong benchmark.  Frank Report, at 7, 11.  In his deposition, Frank testified that he and Wolf followed the same basic lost profits methodology.  Frank Dep., at 146.  On the time-period issue, Frank argues that one must analyze an investment strategy over at least a five-year time horizon to measure its performance accurately.  Frank Report, at 10–11.  I will, somewhat *dubitante*, allow him to present this argument at trial.  I say *"dubitante,"* because there would appear to be

---

[16] Given Frank's deposition testimony, I assume that he will not offer an opinion on whether the Alco portfolios were diversified during the relevant time period.  Under this assumption, I have not analyzed whether such testimony would be admissible.  Should Frank attempt to offer such an opinion at trial, I will allow Alco to renew its motion *in limine* at that time, insofar as the motion addresses that aspect of Frank's proposed testimony.

ground for concluding that the proper time-frame would be the length of the breach, and I

am not clear why Frank would have it otherwise.  In any event, Frank's analysis will be of

clear relevance should Wachovia succeed in proving that the alleged breach began before

1999, as he is the only expert to have considered the portfolios' pre-1999 performance.

On the benchmark issue, Frank offers arguably legitimate reasons for preferring the S&P

1500 to any of Wolf's benchmarks—namely that the S&P 1500 is a broader, more

representative, index, and thus a more plausible and appropriate proxy for the market

portfolio.  *Id.* at 9.

       The upshot is that both Frank and Wolf have presented approaches to calculating

damages that are arguably aggressive, and are certainly highly favorable to their

respective clients.  Both approaches are arguably open to attack on cross-examination, but

neither appears so off the mark as to exclude its presentation.  Moreover, it is at least

possible, if the court should find a breach and should also determine that damages are to

be assessed, that the court would conclude that the best measure of damages would be

some blend of the two approaches, in which case it would be necessary to use both reports

to construct the damages award.  Accordingly, I will deny Alco's motion *in limine*.

## III.    Motions for summary judgment

### A.      Wachovia's motion

       Wachovia moves for summary judgment on the ground that Alco has failed to

meet its burden of coming forward with evidence that (1) Wachovia failed to diversity the

Alco plans' equities portfolios, and (2) Alco suffered damage. Wachovia's predicate is that Alco's experts's testimony on both of those points was fatally flawed and would not be allowed at trial. Because I will allow Niden and Wolf to testify, Alco has met its burden of production.

Wachovia also moves for summary judgment on statute-of-limitations grounds. The parties agree that the applicable limitations period is set forth in 29 U.S.C. § 1113, which requires that actions be filed before the earlier of (1) six years after the date of the last action constituting the breach of duty, and (2) three years after the plaintiff had actual knowledge of the breach. The parties agree that the suit was filed within six years of the last allegedly breaching act; they disagree as to whether it was filed within three years of Alco having actual knowledge of the alleged breach.

The Third Circuit has set the bar high for proving actual knowledge:

> [U]nder 29 U.S.C. § 1113(2), "actual knowledge of a breach or violation" requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm. . . .
>     In so holding, we differ somewhat from the rigid formulation that "[t]he statute of limitations is triggered by . . . knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law," . . . . We disagree that mere knowledge of a transaction is always enough. "Actual knowledge of a breach or violation" requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated.

*Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177–78 (3d Cir. 1992). Subsequent cases confirm that *Gluck* sets forth a two-pronged test requiring knowledge both of the facts

-18-

underlying the breach and that those facts constituted a breach.  *See, e.g.*, *Richard B.*
*Roush, Inc. Profit Sharing Plan v. New Eng. Mut. Life Ins. Co.*, 311 F.3d 581, 587 (3d
Cir. 2002).

Wachovia claims that Alco had actual knowledge of the alleged breach no later
than March 2001 when Wachovia client manager Anthony Waskiewicz sent Alco a letter
recommending changes to Steven Dalton's investment approach.  However, the thrust of
the letter was not that Dalton's approach was unsound, but rather that minor alterations
could improve the portfolios' performance.  *See* Waskiwcicz Letter of March 6, 2001.
Indeed, the letter expressed confidence in Dalton's large-cap secular growth strategy.  *Id.*
("We are confident that Steve Dalton and his large-cap growth strategy will produce
exceptional relative performance going forward, and we believe that introducing a
complimentary style will help the ALCO Industries Group Trust achieve better risk-
adjusted returns over the long term.").  Waskiewicz himself testified that he did not intend
to imply that the portfolios were imprudently invested; he only intended to recommend
changes that would place them on even better footing.  Waskiewicz Dep., at 267, 288.
Moreover, Alco executives testified that they did not read the letter as informing them of
a problem with the way their portfolios were invested.  *See* Devine Dep., at 71, 74–75;
Evanick Dep., at 105.  On the contrary, they testified that they were encouraged by
Waskiwicz's confidence in Dalton's general approach and merely understood the letter as
recommending minor improvements.  Devine Dep., at 71, 74–75; Evanick Dep., at 105.

Given this record, the contention that Waskiewicz's letter gave Alco actual knowledge, in the *Gluck* sense, of a breach of duty is, at best, disputed. Therefore, Wachovia's statute-of-limitations defense is unavailing.

Accordingly, Wachovia's motion for summary judgment will be denied.

**B.     Alco's motion**

Alco moves for summary judgment, claiming that the undisputed facts establish that Wachovia breached its duty of prudent investment and thereby damaged Alco as specified in Wolf's report.

Determining whether an ERISA fiduciary breached the duty of prudent investment is a two-step process. The first step concerns whether the investment portfolio was, on its face, sufficiently diversified. *In re Unisys Sav. Plan Litig.*, 74 F.3d at 438; *see also Metzler*, 112 F.3d at 209. If it was, the inquiry is at an end, and there was no breach. If it was not, the next question is whether the fiduciary can prove that its investment strategy was nonetheless prudent. *In re Unisys Sav. Plan Litig.*, 74 F.3d at 438. On the first issue, the plaintiff has the burden of proof; on the second, the burden shifts to the fiduciary. *Metzler*, 112 F.3d at 209.

Niden testified that, in retrospect, the performance of the plans showed more volatility than a diversified portfolio's performance would have. Niden Report, at 13. She further testified that, given the portfolios' sector and asset-class concentrations, unnecessary volatility should have been expected. *Id.* at 10–12. From this, a rational

factfinder could conclude that Wachovia did not adequately diversify investments. Wachovia challenges her conclusion that the portfolios were facially not diversified through Frank's criticism that her methodology is largely *post-hoc* and ignores how well Wachovia's investment strategy had performed in the past.  Frank Report, at 4–5.  This is a legitimate point, so neither party is entitled to judgment as a matter of law on whether the portfolios were facially diversified.

Wachovia further argues that any lack of diversification was prudent.  On this point, Steven Dalton testified that his strategy was appropriate given Alco's relatively high risk tolerance and its demand for high returns.  Dalton Dep., at 149.  Wachovia also harps on Alco's alleged consent to its investment strategy.  I understand this argument to be somewhat nuanced: Alco's knowledge of and consent to the investment strategy, Wachovia argues, should inform the factfinder's understanding of (1) the somewhat amorphous investment policy statement, and (2) the character and purpose of the plans themselves.  At the summary judgment stage, this point is well-taken.  At trial, I will undertake to determine how intimate Alco's knowledge of the strategy was, and what that says (if anything) about the proper interpretation of the policy statement and the purpose and character of Alco's plans.

Because there is legitimate evidence on both sides of the question of whether Wachovia violated its duty of prudent investment, I will deny Alco's motion for summary judgment on the issue of liability.  Given that Alco is not entitled to judgment on the issue

of liability, addressing the question of damages at this stage would be premature.

*     *     *     *     *

An appropriate order accompanies this opinion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALCO INDUSTRIES, INC.,

                 Plaintiff,

    v.

WACHOVIA CORPORATION, et al..,

                 Defendans.

Civ. No. 04-6090

**ORDER**

November 5, 2007

For the reasons set forth in the accompanying opinion, it is ORDERED that:

(1)    Alco's motion *in limine* (Docket No. 44) to exclude the testimony of Wachovia's proposed expert Stewart Frank is DENIED;

(2)    Wachovia's motion *in limine* (Docket No. 46) to exclude the testimony of Alco's proposed experts is DENIED as to Cathy Niden and Steven Wolf and GRANTED as to Paul Gewirtz;

(3)    Alco's motion for summary judgment (Docket No. 43) is DENIED;

(4)    Wachovia's motion for summary judgment (Docket No. 45) is DENIED;

(5)    the parties will submit a joint pre-trial memorandum in accordance with Local Rule 16.1(d)(2) by December 10, 2007.  That memorandum will, in part (1), state what matters the parties agree on, and, in parts (2) and (3), state, in separate recitals, the respective contentions of the parties as to matters the parties disagree on.  Within a week after filing the joint memorandum, each party may, if it wishes, file a memorandum responding to the contentions of the adversary party contained in part (2) or part (3) of

the joint memorandum.  Thereafter, Deputy Clerk Donna Bozzelli will, after consultation with counsel, schedule a pretrial conference.


BY THE COURT:


/s/ Louis H. Pollak
_____
Pollak, J.